## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **AIDA RAMOS** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **Civil Action No. 11-0380** |
| | § | |
| | § | |
| **MOHAMED AL-BATAINEH, REDA** | § | |
| **AL-BATAINEH, and RASHID, INC.** | § | |
| | § | |
| **Defendants** | § | |

## FINDINGS OF FACT AND CONCLUSION OF LAW

On October 16, 2013, a bench trial was held in the above-styled case. Having considered the evidence in this case and the applicable law, the Court enters the following findings of fact and conclusions of law. Any finding of fact that is more appropriately characterized as a conclusion of law shall be so construed.

### I. Findings of Fact

Plaintiff Aida Ramos ("Ramos") began working for Defendant Mohamed Al-Bataineh ("Mohamed") in 1992. At the time, Mohamed owned a shopping center located at 4626 Yale Street, Houston, Texas, out of which he ran Harvest Food Store ("Harvest"), a small grocer, gas station, and gaming establishment. The evidence shows that Ramos was hired to work in various capacities for Mohamed individually, as owner of the shopping center, and as owner of Harvest. Ramos' work consisted primarily of operating the cash register, assisting customers, and operating the gas pumps at Harvest, but also included cleaning the store, cleaning the sidewalk, running errands, and otherwise attending to the business and personal needs of Mohamed.

Over the next 18 years, Ramos worked continuously under the supervision of Mohamed until she was terminated on October 5, 2010 for taking an afternoon of sick leave. Evidence

reveals that for most of those 18 years, Ramos worked 7 days a week, for 12 to 14 hours a day, and was paid a fluctuating wage of roughly $400 each week in cash from Mohamed. Ramos was allowed two weeks of vacation a year to visit relatives in El Salvador, but otherwise worked from 7 in the morning to 7 at night Monday through Wednesday, and from 7 in the morning until 9 at night, Thursday through Sunday. Ramos was not permitted a lunch break and was effectively the only person working in Mohamed's enterprise for much of this 18 year period. In 2004, at Mohamed's request, Ramos attended training classes and was certified as a Food Service Manager. (Pl. Ex. No. 04). In 2007, again at Mohamed's request, Ramos renewed this certification. (Pl. Ex. No. 05).

While Mohamed denies that Ramos worked the hours charged, his testimony lacks credibility. It is painfully obvious that Mohamed took advantage of Ramos' status as an uneducated immigrant, both professionally and sexually,[1] and subjected her to patently unfair working conditions as well as illegal sexual harassment. Witness after witness testified at trial regarding the extraordinarily long hours that Ramos worked. Ramos kept detailed records of the hours she worked and her compensation, which she provided to an accountant when filing her taxes during these years. Mohamed, on the other hand, maintained no such records of payments or wages paid, did not provide 1099s or W2s to Ramos, and avers in answers to interrogatories that he paid her only $100 to $150 per week.[2] (Pl. Ex. No. 08, at 3).

The majority of the testimony offered by Defendants Mohamed and Reda Al-Bataineh ("Reda") consisted of half-truths and obvious lies. The explanation offered by Reda for the

---

[1] Defense counsel insisted, throughout the trial, on questioning witnesses about the nature of Mohamed and Ramos' sexual relationship, despite consistent admonishment from the Court. The Court now finds that any such sexual relationship is not, as Defendant insisted, evidence of Ramos' motive to bring a false claim, but rather additional evidence of the careless, unprofessional, and unlawful manner in which Mohamed took advantage of Ramos.

[2] This is the only evidence that Mohamed paid Ramos $100-$150 each week, and is offered only to support Mohamed's contention that Ramos was only employed part-time. All other evidence supports a finding that Ramos was paid roughly $400 each week.

simple factual issue of the chain of ownership of Harvest was inconsistent with testimony by his brother, with his own prior testimony, and with records filed with the state. Assumed Name Certificates filed with the state show that Fuad Al-Bataineh ("Fuad") sold Harvest to Radi Al-Bataineh ("Radi") in 2008, and that Radi sold the store to Reda in 2010. (Pl. Ex. No. 7). At trial, Reda denied having bought Harvest from Radi, and became confused by and lost in the mistruths to which he had clearly been instructed to testify. He testified at first that he bought Harvest from his brother Fuad and then stated that he bought it from Mohamed. He initially testified that he paid $10,000 for the store in installments and then recanted and suggested that this money was only being paid as rent to Mohamed as owner of the shopping center. Mohamed also testified that prior to meeting with an accountant to file back taxes for himself and on behalf of his brother and his corporation, he obtained all tax information regarding Harvest from Reda. Reda, however, testified that he only owned Harvest for 3 months, and would not have had such information. When confronted directly at trial with false testimony and his inability to repeat coherently his account of events, Reda finally admitted that the Court should not rely on anything that he said under oath as he was frequently guessing or provided with false testimony. At best, Reda was completely oblivious to the goings-on of both his purported business and business conducted by his family. At worst he was a willing participant in a scheme to avoid liability and ultimately mislead the Court.

It is equally clear that Mohamed's testimony is unreliable and abundantly more clear that his mistruths and evasions were borne of self-interest rather than ignorance. Much like in his recent bankruptcy proceedings, where the trustee moved to dismiss due to failure to provide accurate information, (Pl. Ex. No. 44), Mohamed was, in the present matter, loathe to provide this Court with any reliable information. Mohamed consistently feigned confusion and ignorance as to the business conducted with his brothers. While testifying, he avoided answering questions

posed by opposing counsel or by the Court and refused to read aloud his own prior testimony. Despite offering only bewildered ramblings as to his business dealings in the past 10 years, Mohamed asserted emphatically not only that Ramos worked only part-time as an outside contractor for Harvest, but that for the majority of the time in question, neither Mohamed nor Reda was her employer. The Court, however, finds that any testimony by Mohamed regarding Ramos' employment is part of a concerted effort to avoid liability. Testimony at trial demonstrates that Mohamed filed tax returns for himself, his brothers, and the corporation, Rashid, Inc. Furthermore, his brother Reda testified to the fact that Mohamed handled finances for the brothers. Most tellingly, Reda suggested at numerous times throughout his testimony that Plaintiff's attorney was imposing formalities onto these arrangements, when in fact all of the finances and exchanges which took place between these brothers were not "so serious." Mohamed was at all times the only party aware of which brother owned which businesses and how these businesses were managed.

Because of Defendants' unreliable testimony and a lack of evidence supporting their claims denying liability in the present matter, the Court finds that Defendants have not provided any information that refutes Ramos' claims. The evidence presented by Ramos regarding her employment revealed that there was no employment contract with or wages paid by Harvest, Rashid, Inc., or anybody other than Mohamed al Bataineh. The Court finds that the evidence shows that Ramos was hired by Mohamed, reported to Mohamed, was promoted to management by Mohamed, performed tasks as directed by Mohamed, and was never paid by anybody except for Mohamed. All the evidence shows that between January 27, 2008, and October 5, 2010, Ramos was employed by Mohamed and that he was her direct and only supervisor while she worked at Harvest. Reliable evidence revealed that during that time she worked 92 hours per week, 50 weeks per year, and was paid approximately $400 each week in cash. Ramos' income

tax returns show that she was paid $16,800 in 2008, $22,394 in 2009, and $20,400 in 2010. (Pl. Ex. Nos. 01-03).

## II. Conclusions of Law

The FLSA provides that:

> no employer shall employ any of his employees who in any workweek . . . is employed in an enterprise engaged in commerce . . . for a workweek longer than forty hours unless such employee received compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1). The facts demonstrated above show that from 2008 to 2010, Ramos was employed for well over the statutory 40 hour work week without being paid overtime wages. The only questions are: (1) which Defendants are liable for any such violations as "employers" under the FLSA, (2) whether Ramos meets the definition of "employee" for the purposes of the FLSA, (3) for what time period Ramos is permitted to recover pursuant to the FLSA's statute of limitations, and (4) to what amount of damages Ramos is entitled.

## A. "Employer" Under FLSA

The FLSA broadly defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." 29 U.S.C. § 203(d). Whether a person or entity is an employer under the FLSA is a question of law while subsidiary findings are questions of fact. *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1327 (5th Cir. 1985). The Fifth Circuit has determined that the FLSA employer definition includes "an individual who, though lacking a possessory interest in the 'employer' corporation, effectively dominates its administration or otherwise acts, or has the power to act, on behalf of the corporation vis-a-vis its employees." *Reich v. Circle C. Investments, Inc.*, 998 F.2d 324, 329 (5th Cir. 1993) (quoting *Donovan v. Sabine Irrigation Co.*, 695 F.2d 190, 196 (5th Cir.), *cert. denied*, 463 U.S. 1207 (1983)). Other courts have noted the unique and expansive definition of

"employer," declaring that the FLSA was "intended to identify responsible parties without obfuscation by legal fictions applicable in other contexts." *Parker v. ABC Debt Relief, Ltd. Co.*, 2013 WL 371573 * 3 (N.D. Tex. Jan 28, 2013) (citing *Dole v. Simpson*, 784 F. Supp. 538, 544-45 (S.D. Ind. 1991)). The Fifth Circuit employs the "economic reality" test to determine who qualifies as an FLSA employer. *Watson v. Graves*, 909 F.2d 1549, 1553 (5th Cir. 1990). This test includes inquiries into: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id.* Where the plaintiff has demonstrated an employer-employee relationship, the burden of establishing an exception to the FLSA overtime provisions is on the employer. *Smith v. City of Jackson, Miss.*, 954 F.2d 296, 298 (5th Cir. 1992).

The Court finds that Defendant Mohamed Al-Bataineh meets the definition of "employer" for the purposes of the FLSA. Not only was Mohamed the only boss of whom Ramos was ever aware, but he dominated the administration of all of his family's business, including Harvest. *See Reich*, 998 F.2d at 329. Mohamed wholly owned the shopping center and Harvest itself for almost the entirety of Ramos' employment. Testimony also shows that he controlled his brothers' finances, their corporate entities, and Harvest during the period in question. *See id.* Application of the "economic reality" test illustrates that whether Ramos was technically employed by Harvest, Reda, or Mohamed from 2008 to 2010, and regardless of whether or not Mohamed actually owned Harvest during this time, Mohamed himself was in reality Ramos' "employer." Mohamed hired Ramos, supervised and controlled all of her work, determined how much money she would be paid, paid her out of his own pocket, and ultimately made the decision to terminate her. *See Watson*, 909 F.2d at 1553. This is precisely the type of arrangement that Congress' expansive definition of employer was designed to capture. *See*

*Parker*, 2013 WL 371573 *3. The "legal fiction" of any distinction between Harvest and Mohamed is inapplicable in the FLSA overtime context. *Id.* The Court thus finds that from 2008 to 2010, Mohamed was himself Ramos' employer, subject to all the terms of the FLSA. Ramos has failed to show any evidence that either of the additional named Defendants, Reda Al-Bataineh or Rashid, Inc., meets the FLSA's definition of "employer."

## B. "Employee" Under FLSA

In order to recover under the FLSA overtime provisions, a plaintiff must demonstrate that he or she was an "employee" of the defendant. 29 U.S.C. § 207(a)(1). Courts liberally construe the term "employee" for the purposes of the FLSA. *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 326 (1992) (The FLSA "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles."). In the Fifth Circuit, the operative question in determining if an individual is an employee under the FLSA is whether, "as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself." *Hopkins v. Cornerstone Am.,* 545 F.3d 338, 343 (5th Cir. 2008). As part of this inquiry, courts look to five non-exhaustive factors: (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship. *Id.*

The Court is not convinced by Defendants' efforts to characterize Ramos as an outside contractor rather than an employee. Ramos fits the definition of an employee based on the five factor test from *Hopkins*. First, Mohamed exercised a great deal of control over Ramos, dictating her hours and her tasks while at work and directing her to attend certification courses. *See Thibault v. Bellsouth Telecomms., Inc.,* 612 F.3d 843, 846-47 (5th Cir. 2010) (considering the

7

extent of an employer's direction of employee's activities in terms of both time and manner when determining "degree of control"). Second, while relatively insignificant in this case, any investments made with regard to Ramos' work were made by Mohamed himself, and certainly not by Ramos. *See Id.* (finding that substantial equipment related expenditures made by the "employee" was evidence the he may in fact have been an independent contractor). All evidence shows that Ramos used equipment provided by Mohamed while cleaning his facilities or manning the cash register at Harvest. Third, Mohamed completely controlled Ramos' opportunity for profit and loss, since he set her wage and was her sole employer during the time in question. *See Carrell v. Sunland Const., Inc.*, 998 F.2d 330 (5th Cir. 1993) (holding that employer's control over employees hours of work and hourly rate was evidence of employer's control over employee's profits); *Cromwell v. Driftwood Elec. Contractors, Inc.*, 348 Fed. App'x 57, 61 (5th Cir. 2009) (recognizing that plaintiffs' inability to take other work because of the hours required by the employer weighed in favor of finding that the employer controlled employee's profits). There is no evidence that Ramos ever had another employer during this time and the extreme number of hours worked for Mohamed suggests that additional employment would have been an impossibility. Fourth, Ramos' duties did not exhibit the type of unique skill or significant initiative typically indicative of an independent contractor. *See Herman v. Express Sixty-Minutes Delivery Service, Inc.*, 161 F.3d 299, 305 (5th Cir. 1998) (holding that "routine work, which requires industry and efficiency is not indicative of independence and nonemployee status"). Fifth, and most importantly, the length of time during which Ramos worked for Mohamed and his insistence that she go through management training both suggest that the relationship was "permanent" for the purposes of the *Hopkins* test. *See Hopkins*, 545 F.3d at 345 (holding that the length of the relationship, whether the worker works in a similar capacity for other companies, and the worker's ability to terminate the relationship all have bearing on the

permanency of the employment relationship); *Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 666 (5th Cir. 1983) (characterizing relationships lasting between ten months and three years as "substantial period[s] of time" for the purposes of this inquiry). While this list of factors is non-exhaustive, the Court need not look to other factors to find that Ramos is properly characterized as an employee rather than an outside contractor for the work she did for Mohamed over an 18 year period.

## C. Statute of Limitations

FLSA overtime claims are subject to a two-year statute of limitations for ordinary violations and a three-year period for willful violations. 29 U.S.C. § 255(a). "A cause of action accrues at each regular payday immediately following the work period during which the services were rendered for which the wage or overtime compensation is claimed." *Halfert v. Pulse Drug Co.*, 821 F.2d 261, 271 (5th Cir. 1987). Thus, while FLSA overtime claims are continuing violations, employees are permitted to seek wages only for the statute of limitations period, not for related violations that took place prior. *Hendrix v. Yazoo City*, 911 F.2d 1102, 1103 (5th Cir. 1990). An employer's violation is "willful" and, therefore, subject to the three-year statute of limitations period under the FLSA if the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). The plaintiff bears the burden of establishing willful conduct by his or her employer. *Cox v. Brookshire Grocery Co.*, 919 F.2d 354, 356 (5th Cir. 1990).

In *McLaughlin*, the Supreme Court was clear that "willfulness" does not mean simply knowledge that the FLSA exists. *McLaughlin*, 486 U.S. at 132-33. Rather, Congress clearly "intended to draw a significant distinction between ordinary violations and willful violations." *Id.* Willfulness has been found where the plaintiff establishes that the employer actually knew it was violating the FLSA or was on notice that its practices violated the FLSA. *See Singer v. City*

*of Waco*, 324 F.3d 813, 821-22 (5th Cir. 2003) (upholding jury finding of wilfulness where employer's attorney advised employer not to investigate despite knowledge that employees were being paid incorrectly); *Reich v. Bay, Inc.*, 23 F.3d 110, 117 (5th Cir. 1994) (upholding district court's finding of willfulness where the employer continued practices that had been deemed violations of the FLSA after notice by the Department of Labor). Conduct that is merely negligent or unreasonable, however, does not rise to the level of a "willful" violation. *See Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1416 (5th Cir. 1990).

The Court finds that Mohamed's failure to pay Ramos overtime for the 92 hours she worked weekly over an almost 20-year period constitutes a willful violation. While the Fifth Circuit has typically found willfulness in the case of knowing or intentional violations, the *McLaughlin* standard requires only a showing of reckless disregard. The conduct in this case clearly exceeded mere negligence. Courts have typically found violations only to be negligent in cases dealing with an employee's classification as exempt or an equally subtle area of law, where an employer's claimed overtime mistake can justifiably be deemed unreasonable but still not rise to the level of willful. *See Mireles*, 899 F.2d at 1416 (holding that an employer's failure to provide overtime based on a miscalculation of "idle time" was merely negligent not willful); *Villegas v. Dependable Const. Services, Inc.*, 4:07-CV-2165, 2008 WL 5137321 * 26 (S.D. Tex. Dec. 8, 2008) (finding that an employer's mistaken classification of an employee as exempt in reliance on an improper classification system did not rise to the level of willfulness). In this case, however, Mohamed's violation more clearly rose above the level of negligence to willfulness. Mohamed testified that he was aware of the FLSA and its overtime requirements. Furthermore, the Court's factual findings that Ramos consistently worked 92 hours a week despite being paid between $300 and $400 a week demonstrates an egregious level of under-compensation of which

Mohamed was certainly aware. The Court therefore finds that any FLSA overtime violations were willful and thus subject to a three-year statute of limitations period.

## D. Damages

The FLSA provides a general rule that, unless exempt, any employee who works more than 40 hours in a work week must be paid not less than one and one-half times his or her regular rate of pay for those overtime hours. 29 U.S.C. § 207. For an employee who is paid an hourly rate, that hourly rate is the employee's regular rate. *See* 29 C.F.R. § 778.110(a). When an employee is paid a weekly salary, this formula is modified slightly: the regular hourly rate is computed by "dividing the salary by the number of hours which the salary is intended to compensate." 29 C.F.R. § 778.113(a), *see also Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 580-81 (1942). Courts have identified two arrangements in which regular rate must be calculated in this way: (1) fixed pay for regular hours, and (2) fixed pay for fluctuating hours. *Givens v. Will Do, Inc. Houston*, 4:10-CV-02846, 2012 WL 1597309, *3 (S.D. Tex. May 4, 2012).

The first of these arrangements is where the employer and employee intended for compensation to be fixed based on a set number of hours per week, less than, equal to, or greater than 40. *See Black v. SettlePou, P.C.*, No. 12-10972, 2013 WL 5612304, at * 4-6 (5th Cir. Oct. 11, 2013) (holding that where employee was operating under the reasonable assumption that her salary compensated her only for 40 hours a week, calculation of overtime should reflect the same). In these cases, overtime is calculated using the "standard method": by dividing the actual weekly wage by the hours intended to be worked, and then multiplying that figure by 1.5. *Givens*, 2012 WL 1597309, *3. Because the parties understood that the employee was only to work a certain number of hours per week, he or she must be compensated at the overtime rate for all hours worked beyond those hours. *Id.* For example, if the parties agree that the employee will

work a 45-hour week and she is paid a set salary of $450 per week, her regular rate is $10 per hour. This is true even if the employee works 60 hours one week. For that week, we find that the employee has been compensated "straight-time" for the first 45 hours, but was wholly uncompensated for the additional 15 hours worked. Thus, the employee is still due 1.5 times the regular rate of $10, or $15, for each of the 15 additional hours and is still due 1/2 the regular rate for the 5 under-compensated hours worked over 40. The total overtime due in such a case is $250.

The other type of arrangement addressed by the courts is where parties intended for the weekly salary to reflect whatever hours the employee ultimately worked. *Id.* In these cases overtime is calculated using the "fluctuating work week method." *See Ransom v. M. Patel Enterprises, Inc.*, No. 12-50534, 2013 WL 4402983, at *7-8 (5th Cir. August 16, 2013). For the fluctuating workweek method the regular rate is calculated by dividing the actual hours worked each week into the fixed salary. *Blackmon v. Brookshire Grocery Co.*, 835 F.2d 1135, 1138-39 (5th Cir. 1988). Unlike in the standard method, this employee has already been compensated straight time for *all* hours worked, and so overtime is determined by multiplying all hours over 40 in that workweek by only one half the regular rate for that particular week. *Id.* Using the figures from the prior example, if the parties have agreed to a fluctuating workweek, in a week where the employee works 45 hours, her regular rate is $10 per hour, while in a 60-hour week, her regular rate is $7.50. Overtime for the first week is then applied at a rate of 1/2 the regular rate of $10, or $5, for each of the 5 hours worked over 40, for a total overtime of $25. For the 60-hour week, the overtime rate is 1/2 the regular rate of $7.50, or $3.75, and applied to the 20 hours of overtime worked, it results in an owed overtime wage of $75.

Neither the standard nor the fluctuating workweek method is precisely applicable to the arrangement in the present case, where an employer and an employee agreed to a set weekly

schedule with fluctuating pay. Typically courts would look to whether the parties' initial understanding and course of conduct suggested a fluctuating workweek. *See Black*, 2013 WL 5612304, *4. However, the Court finds that the intended hours and the actual hours worked are the same in this case. The parties intended that Ramos would work 92 hours each week, and that is in fact what she did.[3] The Court thus finds that the regular rate should be calculated by dividing the actual weekly wage, found by dividing the reported annual wages by the number of weeks worked, by the 92 hours worked each week by Ramos.

In 2008, Ramos reported $16,800 on her income tax return, and evidence shows that she worked 50 weeks during that year. Ramos' actual weekly wage during this time was $336, and so, based on a 92-hour workweek, Ramos' regular rate was $3.65 per hour. In 2009, Ramos reported $22,394 on her income tax return, and evidence shows that she worked 50 weeks during that year. Ramos' actual weekly wage during this time was $447.88, and so, based on a 92-hour workweek, Ramos' regular rate was $4.87 per hour. In 2010, Ramos reported $20,400 on her income tax return and evidence shows that she worked 38 weeks during that year, since she took a 2 week vacation over the summer and was terminated on October 5. Ramos' actual weekly wage during this time was $536.84 and so, based on a 92-hour workweek, Ramos' regular rate during this time was $5.84 per hour.

The Fifth Circuit has held that the fluctuating workweek method cannot be applied exactly if this calculation results in a regular rate below the federal minimum wage. *Blackmon v.*

---

[3] The Court has found that all evidence supports a finding that Ramos consistently worked 92 hours each week during the 18 years that she worked for Mohamed. Ramos, however, in her own complaint and other filings has at times mistakenly understated these hours. Ramos argued in her complaint that she regularly worked only 77 hours per week during the period in question, despite testimony at trial that she worked three 12-hour days and four 14-hour days each week. Ramos also mistakenly calculates compensable overtime hours based on time worked over 8 hours each day, rather than the hours worked in excess of 40 each week, concluding that she was entitled to 36 hours of overtime pay each week. However, this calculation ignores the fact that Ramos worked 7 days a week, and thus would by this calculus be incorrectly expected to work 56 hours a week at regular pay. The Court finds these to be mathematical errors, and instead finds the number of overtime hours to be 52 hours weekly by subtracting 40 hours from the actual 92 hours worked each week by Ramos.

*Brookshire Grocery Co.*, 835 F.2d at 1138 n.1. "In such an instance, the minimum wage must be paid and that minimum serves as the regular rate of pay for purposes of computing overtime payments." *Id.* The issue of calculating regular rate below minimum wage was recently revisited by the Fifth Circuit in *Ransom*, 2013 WL 4402983. The Fifth Circuit affirmed the *Blackmon* decision, noting that *Blackmon* had "provided the appropriate solution." *Id.* at *8. The court, thus, confirmed that in such cases minimum wage serves as the regular rate of pay for the purposes of computing overtime payments. *Id.* The court's direction on this matter, however, is not entirely clear, as the opinion goes on to note that "the FLSA only requires that the minimum wage be paid for straight-time worked." *Id.* This language suggests, perhaps, that the FLSA only requires that employees be paid minimum wage for "straight-time" but not 1.5 times minimum wage for their overtime hours. This Court declines to read that language in this way, since to do so would be inconsistent with previous language in the *Ransom* opinion that the "minimum wage serves as the regular rate of pay for the purposes of computing overtime payments." *Id.*

In the present case, Ramos' regular rate for each year falls well below the statutory minimum wage. From July 24, 2007 to July 24, 2008, the minimum wage was $5.85; from July 25, 2008 to July 24, 2009 the minimum wage was $6.55; and since July 24, 2009, the minimum wage has been $7.25. 29 U.S.C. § 206(a)(1). This Court finds that, pursuant to *Blackmon*, it must ensure that Ramos was always paid minimum wage for 40 hours a week and paid 1.5 times minimum wage for all hours worked above 40 hours a week. For the calculation of unpaid wages, this means that the Court must simply calculate that amount for a 92-hour workweek, and subtract what Ramos was actually paid each week. The minimum amount that Ramos must be paid for a 92 hour work week pursuant to *Blackmon* and the FLSA overtime and minimum wage provisions is found by multiplying the appropriate minimum wage by 40, and 1.5 times that minimum wage by the overtime hours worked by Ramos, or 52 hours. For the period from

January 27, 2008 to July 24, 2008, the minimum weekly wage for a 92-hour workweek was $690.30; for the period between July 24, 2008 and July 24, 2009, the minimum weekly wage for a 92-hour workweek was $772.90; and since July 24, 2009, the minimum weekly wage for a 92-hour workweek has been $855.50.[4]

In 2008, Ramos's weekly wage, as calculated above, was $336. Ramos filed this action on January 27, 2011, and so, the earliest week for which she can recover lost wages under the FLSA is the week beginning January 27, 2008. Thus, Ramos worked for 26 weeks between January 27, 2008 and July 24, 2008, when the federal minimum wage was increased from $5.85 to $6.55. During that time she is owed the difference between the minimum of $690.30 and the $336 she was paid for each of these 26 weeks. This equals $9,211.18. She is additionally owed the difference between the increased minimum of $772.90 and the $336 she was paid for the 21 weeks that she worked from July 24, 2008 until the end of the year.[5] This equals $9,171.90. Ramos is, therefore, owed $18,386.08 for 2008.

In 2009, Ramos's weekly wage, as calculated above, was $447.88. Ramos worked for 29 weeks in 2009 prior to the federal minimum wage change on July 24 from $6.55 to $7.25. During that time she is owed the difference between the minimum of $772.90 and the $447.88

---

[4] Ramos asserts that during the time in question she was compensated at a rate above minimum wage for all hours worked, including those over 40 hours each week. Thus, Ramos does not seek compensations for unpaid "straight-time," but rather seeks to be compensated for the difference between straight-time and the overtime rate for the 52 overtime hours she worked each week. This is unsupported by the facts and Ramos has substantially understated the egregiousness of her under-compensation. In fact, as demonstrated above, based on her yearly income Ramos cannot have been paid minimum wage for 92 hours each week. Ramos cannot state both that she was paid above minimum wage and that she was compensated for 92 hours worked a week. Rather, on the facts here, this Court must either find that Ramos was only compensated for 40 hours per week at a rate above minimum wage, but was entirely uncompensated for all additional hours or, in the alternative, that Ramos was paid dramatically under the minimum wage for all hours worked. Based on the Fifth Circuit precedent cited above, the Court has found the latter; that Ramos worked 92 hours each week for less than minimum wage.

[5] The Court found at trial that Ramos took two weeks off each summer to visit relatives in El Salvador. Because the plaintiff did not show facts demonstrating that this vacation was taken prior to the increased in minimum wage, the Court must find that she failed to meet her burden and presume that such vacation was taken under the new minimum wage regime each year.

she was paid for each of these 29 weeks. This equals $9,425.58. She is additionally owed the difference between the increased minimum of $855.50 and the $447.88 she was paid for the 21 weeks that she worked from July 24, 2009 until the end of the year. This equals $8,560.02. Ramos is, therefore, owed $17,985 for 2009.

In 2010, Ramos's weekly wage, as calculated above, was $536.84. Ramos worked for 38 weeks total in 2010 prior to being terminated on October 5. During that time she is owed the difference between the minimum of $855.50 and the $536.84 she was paid for each of these 38 weeks.[6] Ramos is, therefore, owed $12,109.08 for 2010. In total, for the period from January 27, 2008 to October 5, 2010, Ramos is owed $48,480.16 in unpaid wages by her employer, Mohamed Al-Bataineh.

Additionally, the FLSA provides that employers who violate § 207 of the FLSA are liable not only for the unpaid wages owed the employee, but also an additional equal amount of liquidated damages. 29 U.S.C. § 216(b). However, if the employer can demonstrate that he or she acted in good faith and had reasonable grounds for believing he or she was not violating the FLSA, then the court may exercise its discretion to reduce such liquidated damages. 29 U.S.C. § 260. The Court is only able to exercise such discretion if the employer meets his or her "substantial burden of proving to the satisfaction of the trial court that its acts giving rise to the suit are *both* in good faith *and* reasonable." *Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1415 (5th Cir, 1990).

In the present matter, Defendants have not demonstrated any such evidence of good faith or reasonableness. In fact, in order to determine the appropriate statute of limitations in this case, this Court has already found that Mohamed "wilfully" violated the FLSA. Such a finding

---

[6] The federal minimum wage did not change during 2010. *See* 29 U.S.C. § 206(a)(1) (the minimum wage has remained the same since July of 2009).

precludes a showing of good faith.[7] Therefore, Ramos is entitled to full liquidated damages in the amount of $48,480.16, for a total award of $96,960.32.

Plaintiff has 10 days from the date of this Order to file a motion for attorneys' fees. Defendant has 5 days from Plaintiff's filing to file a response. Final judgment will be entered after the Court considers motions for attorneys' fees.

The Clerk shall enter this Order and provide a copy to all parties.

SIGNED on this the ___15st___ day of November, 2013, at Houston, Texas.

VANESSA D. GILMORE
**UNITED STATES DISTRICT JUDGE**

---

7

 The Fifth Circuit has held that a failure to show willfulness for statute of limitations purposes does not preclude a finding that the employer failed to act in good faith for the purposes of calculating liquidated damages. *Mireles*, 899 F.2d at 1407. This Court is confident, however, that a showing of an actual willful violation of the FLSA, necessarily precludes a finding that the employer was acting in good faith.

17